# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VIRGINIA PENNINGTON, individually and on behalf of all others similarly situatied, <br><br>Plaintiff, <br><br>v. <br><br>TRAVELEX CURRENCY SERVICES, INC., WEST SUBURBAN BANK, and WEST SUBURBAN BANCORP, INC., <br><br>Defendants. | No. 14 C 4297 <br><br> Judge John J. Tharp, Jr. |

## ORDER

For the reasons set forth in the accompanying statement, the Court grants Defendants' motions to dismiss [36] [39] [42]. All four counts of Plaintiff's Amended Complaint are dismissed without prejudice. A status hearing in this matter is set for July 29, 2015, at 9:00 a.m.

## STATEMENT

Plaintiff Virginia Pennington claims that the defendants, a currency exchange and a bank, charged her an unfavorable exchange rate—which she defines as a rate less favorable than the interbank exchange rate—when she bought and sold euros through a foreign currency card program the defendants operated. She says the rates charged were fraudulent and violated the program contract, but in fact the defendants never promised her a particular exchange rate—and certainly not the interbank rate—so there was neither fraud nor breach of contract. Accordingly, the plaintiff's claims must be dismissed.

## I.     Factual Background[1]

Defendants Travelex Currency Services, Inc. ("Travelex") operates a foreign currency exchange business through retail locations and on the internet. West Suburban Bank ("WSB") is a bank chartered under the laws of Illinois, and West Suburban Bancorp, Inc. ("WS Bancorp") is an Illinois corporation that is the parent and sole shareholder of WSB. The distinction between these entities is not material to the issues presented and for simplicity this opinion refers to these defendants as the "Bank."

---

[1] The relevant facts are drawn from the Amended Complaint, Dkt. 35. On a motion to dismiss, the Court assumes that all well-pleaded facts of the complaint are true, and draws all reasonable inferences in favor of the plaintiff. *See Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012).

In 2008, Travelex and the Bank introduced a prepaid foreign currency card entitled "Travelex Chip and PIN Cash Passport" ("Cash Passport"). Each card was denominated in either British Pounds or Euros. Consumers could load prepaid amounts onto the card balance by paying U.S. Dollars, which would be exchanged for a fixed balance in the foreign currency of the card. With the balance denominated in foreign currency, consumers could spend that foreign currency overseas without any further currency exchange transactions. Consumers could also cash out the card balance by withdrawing the card balance, "subject to exchange rate fluctuations." *See* User Guide, Dkt. 35-1, at 4.

In 2011, Plaintiff Virginia Pennington purchased a Cash Passport card from a Travelex store in Dallas, Texas. A uniformed Travelex employee handed Pennington the Cash Passport User Guide and told Pennington that the Cash Passport offered an "excellent exchange rate" and "zero percent commission" for loading or cashing out the card in the store. Am. Compl., Dkt. 35, at ¶ 16. When Pennington asked the Travelex employee whether any costs or fees were associated with the card, the Travelex employee responded, "no, it is free." *Id.* Pennington then purchased a Euro-denominated Cash Passport card with $500 in U.S. currency, which was exchanged—at a rate less favorable than the interbank exchange rate available to financial institutions on the global foreign exchange markets—for a prepaid balance of Euros on the card. Pennington's daughter then took the card to Europe, spent some of the balance in Europe, and returned with a remaining balance. Seeking to avoid the "inactivity fee," Pennington then cashed out the card for U.S. currency, again at a rate less favorable than the interbank exchange rate. *See id.* at ¶ 18. As a result of the unfavorable rates for both loading and cashing out the card, Pennington withdrew $77 less than she would have if the interbank exchange rate had been applied in both transactions. *Id.*

After realizing that the exchange rates applied to the Cash Passport were not as favorable as the interbank exchange rates,[2] Pennington filed a four-count complaint in this case,[3] on behalf of herself and a putative class of Cash Passport customers.[4] Pennington argues that the $77 difference between applying Travelex's exchange rates and applying the interbank exchange rate were "hidden and undisclosed fees and commissions" prohibited by contract and constituted fraud under both the common law and the Illinois Consumer Fraud and Deceptive Practices Act (the "ICFA"), 815 ILCS § 505/2. Am. Compl., Dkt. 35, at ¶¶ 18, 26, 32-33, 38-39. Pennington further pleaded in the alternative that the defendants unjustly enriched themselves by charging excessive exchange rates. The defendants have moved to dismiss the claims with prejudice. For

---

[2] Neither the amended complaint nor Pennington's briefs explain why Pennington failed to realize that she had been charged a less favorable rate than the interbank rate after she loaded the card; at that point, the rate applied was plainly discernible.

[3] Pennington has since amended her complaint, but the amended complaint has the same four counts as the original complaint. *Compare generally* Compl., Dkt. 1, *with* Am. Compl., Dkt. 35.

[4] This opinion does not address the claims of any other putative class member and, as the class has not been certified, the dismissal of this case as to any putative class members is without prejudice.

the reasons set forth below, the Court concludes that Pennington fails to state a claim and therefore grants the defendants' motions.[5]

## II.    Analysis

Pennington alleges an agreement existed between the defendants and her, the terms of which obligated defendants to provide a low exchange rate and to charge no undisclosed fees or commissions. According to Pennington, defendants violated these obligations by charging hidden load and cash-out fees in its excessive exchange rate. As stated in the Terms and Conditions, Illinois law governs the agreement. Under Illinois law, to state a cause of action for breach of contract a plaintiff must allege four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). The contract dispute in this case centers on determining which promises were enforceable and whether the defendants have breached any of these terms.

The defendants also move to dismiss Pennington's fraud counts, brought under both the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA") and common law. Under the ICFA, a plaintiff must show "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010). Similarly, to prevail on a common law fraud claim, the plaintiff must show "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (Ill. 1996).

All four counts in the complaint depend on the theory that by applying an unfavorable exchange rate, defendants broke four promises: (1) providing an "excellent exchange rate, (2) "free" Load and Cash out fees, (3) the oral promise of "no fees," and (4) charging "0% commission with commission-free buy back." Am. Compl., Dkt. 35, at ¶ 1. While it is undisputed that the Terms and Conditions and the Table of Fees and Limits form an agreement between Pennington and WSB, these alleged promises do not appear directly in these written instruments. Rather, these promises appeared on http://www.us.travelex.com (the "Travelex website") and in oral statements made at the point of sale. The defendants dispute that these oral representations or the Travelex website constitute part of the contract, but the Court does not need to decide the issue. Even assuming that these four alleged promises constitute part of the contract, Pennington has failed to state a claim for breach of contract because a promise to provide an "excellent exchange rate" is not enforceable, and the other alleged promises were not breached even under the facts stated in the complaint. And because Pennington has not shown that these promises were false representations, her fraud claims fail as well.

---

[5] This opinion addresses only what the Court views as the fundamental deficiency in the amended complaint. The defendants raise other challenges to the complaint which are not addressed here but remain available to the defendants in the event that the plaintiff repleads in an effort to cure the deficiencies noted in this opinion.

### A. "Excellent Exchange Rate"

Pennington alleges that she was promised an "excellent exchange rate" but the defendants breached this promise by imposing an unreasonably high exchange rate.[6] To be enforceable, contract terms must be sufficiently definite or certain so as to give courts a "basis for deciding whether the agreement has been kept or broken." *Acad. Chi. Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981, 983 (Ill. 1991); *see also Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 515 N.E.2d 61, 65 (Ill. 1987) (noting that a contractual promise to include a hotel in "appropriate listings" in a telephone directory might be indefinite as to whether categories such as "Caterers" or "Cocktail Lounges" were "appropriate listings," but was clear with respect to the category of "Hotels"). This rule applies to individual terms that are vague or ambiguous, as well. *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992) (statement that a party would "do [its] very best to make this project a success" was too vague to be an enforceable contractual promise); *Wald v. Chi. Shippers Ass'n*, 175 Ill. App. 3d 607, 617-20, 529 N.E.2d 1138, 1145-47 (Ill. App. Ct. 1988) (paragraph promising that a party "shall assist in obtaining the largest possible volume of acceptable freight for this consolidation," in an otherwise enforceable contract, was "not defined . . . in a manner definite and certain enough for the court to enforce").

Turning to the promise at issue here, "excellent exchange rates" is not a definite and certain term because the contract identifies no objective criteria to determine the level of "excellence" of the rate charged. "Excellent" compared to what? Pennington argues that the interbank exchange rate is the standard by which "excellence" should be measured, and urges the Court to calculate damages by simply calculating the difference between the charged rate and the interbank rate. *See* Am. Compl., Dkt. 35, at ¶ 29; *see also, e.g. id.* at ¶ 26, (one can simply compare the Cash Passport exchange rate to the interbank exchange rates and analyze whether it is "competitive with the interbank rate"); Pl.'s Resp., Dkt. 46, at 3 (Travelex was required to charge a rate "comparable to the interbank rate"; *id.* at 14 (plaintiff was entitled to receive "essentially the interbank rate"). She provides no basis, however, for assuming that an "excellent" retail rate must be equal to the interbank rate, nor could she. The interbank rate is a *wholesale* rate; Pennington was a *retail* customer. She cannot plausibly allege that she was entitled to a wholesale rate. As the Seventh Circuit has explained:

> Money is just a commodity in an international market. *See Dunn v. CFTC*, 519 U.S. 465, 117 S. Ct. 913, 137 L. Ed. 2d 93 (1997). [Foreign currencies] are for sale—at one price for those who buy in bulk . . . and at another, higher price for those who buy at retail and must compensate the middlemen for the expense of holding an inventory, providing retail outlets, keeping records, ensuring that

---

[6] Whether a rate is unfavorably "high" or "low," of course, depends on whether one is buying or selling the currency in question. By "high," Pennington presumably means a rate that resulted in a higher cost to her. Pennington concludes that she was overcharged by over 15% on the exchange rate by counting two separate transactions: the initial loading of Euros onto the card, paid for with U.S. currency, and then the cashing out of those Euros, withdrawn as U.S. currency. *See* Am. Compl., Dkt. 35, at ¶¶ 16, 18.

> the recipient is the one designated by the sender, and so on. . . .
> The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees.

*In re Mexico Money Transfer Litigation,* 267 F.3d 743, 749 (7th Cir. 2001); *see also id.* at 1 (foreign exchange spread is "the difference between the retail currency exchange rate quoted to customers and the wholesale (interbank) rate . . . at which [the defendant banks] buy [the foreign currency]). The defendants promised Pennington an "excellent" rate, not the wholesale interbank rate—a rate at which they would earn no profit on the transaction. Describing the rate as "excellent" implies a relative comparison between rates; if anything, it suggests that the rate charged by the program was ***not*** the interbank rate.[7]

And to the extent that it suggests a rate comparison—whether between the rate Pennington was charged and the interbank rate, or between the retail rates charged by the defendants in comparison with other retail currency exchangers—the promise of an "excellent" rate is nothing more than a vague and imprecise statement that is too indefinite to be enforced. At what point does the markup above the interbank rate cease to qualify as excellent? How much lower than competitors' retail rates does the defendants' retail rate have to be to satisfy this amorphous standard? Plaintiff, who wants the interbank rate, fails to identify any other standard against which the "excellence" of the defendants' rates must be measured. She claims that a promise to provide an "excellent rate" is not a license to "gouge" the customer, but cannot tell us where the line between gouging and not gouging falls. *See* Pl.'s Resp., Dkt. 46, at 7. As a matter of contract law, the term "excellent rate" is simply too vague to be enforced. *See Beraha*, 956 F.2d at 1441 ("do [its] very best to make this project a success"); *Wald*, 175 Ill. App. 3d at 617 ("shall assist in obtaining the largest possible volume of acceptable freight for this consolidation"). And for Pennington's fraud claims, this promise belongs to the realm of puffery rather than misrepresentation. "Puffing denotes the exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 73, 879 N.E.2d 910, 926 (Ill. 2007) (words that imply opinions about quality, such as "high-quality," "expert workmanship," custom quality," "perfect," "magnificent," "comfortable," and "picture perfect," are not actionable); *see also Carlay Co. v. Fed. Trade Comm'n*, 153 F.2d 493, 496 (7th Cir. 1946) ("words [such] as 'easy,' 'perfect,' 'amazing,' 'prime,' 'wonderful,' 'excellent,' are regarded in

---

[7] And, indeed, the Travelex website explained that the Plaintiff would not be able to transact at the interbank rate. Pennington argues that this portion of the website cannot be considered on the defendants' motion to dismiss, Pl.'s Resp., Dkt. 47, at 11 n.6, but she invokes the Travelex website in her complaint—*see, e.g.*, Am. Compl., Dkt. 35, at ¶¶ 12, 14—and those allegations refer to the website in its entirety. Accordingly, the information on web pages that Pennington chose not to highlight are fair game as well. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (describing this rule as the "incorporation-by-reference doctrine"). In any event, the website disclosure that the rates charged were not the interbank rates only confirms what is clear even without reference to the website. *See* Fed. R. Evid. 201(b)(2).

law as mere puffing or dealer's talk upon which no charge of misrepresentation can be based"). The characterization of the Cash Passport's exchange rate is plainly of this ilk and is therefore not an enforceable promise.

### B. "No Fees," "Free Load and Cash Out Fees," and "0% Commission"

Pennington's claims that Travelex charged fees and commissions in connection with loading and cashing out the cards all rest on the premise that the exchange rate Travelex applied to these transactions was too high—so high that the exchange rate effectively included fees and commissions on these transactions. Notably, Pennington has not alleged there were any additional charges labeled as "load fees" or "cash-out fees," or even that Pennington was charged a different rate than what she would have received in the same store for cash Euros. Instead, Pennington relies solely on a definition of "fee" or "commission" that includes the profit margin that defendants made on her transaction.

The Seventh Circuit effectively rejected the notion that the spread between a retail foreign exchange rate and the wholesale interbank rate constitutes a "fee" of any sort in *In re Mexico Money Transfer Litigation*. 267 F.3d at 749. There, the Court concluded that there was no substance to a a claim by currency exchange customers that the defendants' ads claiming to charge only a $15 fee for wiring $300 to Mexico were fraudulent because the cost of the transaction also included the retail/wholesale spread; they argued, in essence, that the markup from the interbank rate constituted a hidden fee in addition to the disclosed $15 charge collected from the customers at the counter.[8] The Seventh Circuit rejected that argument—which is indistinguishable from Pennington's argument—because there is no requirement for retailers to disclose their markups from wholesale costs. "Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods." 267 F.3d at 749. Markups from wholesale prices to retail prices are not fees charged to consumers; they are the customary incidents to commercial transactions that permit retailers to cover their costs and earn a profit. *See also Sanchez v. American Express Travel Related Servs. Co., Inc.*, 372 Ill. App. 3d 449, 459-60, 865 N.E.2d 410, 419 (Ill. App. Ct. 2007) (following *In re Mexico Money Transfer Litigation* because "defendant's profit-seeking behavior should have been evident to plaintiff").

Further, the language of the contract itself clearly contemplates different exchange rates set by different entities. *See* User Guide, Dkt. 35-1, at 7 (disclosing a 5.5% markup over the "exchange rate determined by MasterCard" for purchases denominated in other currencies, explaining that when viewing a balance on an ATM in another currency, "the exchange rate applied may be different than ours," and disclosing that "the selling agent will apply their own foreign exchange rate" when closing the card). Accordingly, the only reasonable definition of "fees," in the context alleged by Pennington, includes only charges specific to those types of transactions, not the profits made on the exchange rate. In promising "no fees" for loading or

---

[8] The case involved review of an objection to a settlement agreement. The Court affirmed the district court's denial of an objection to the adequacy of the settlement for the class, holding that the claims asserted, including the undisclosed fee argument, "had only nuisance value." 267 F.3d at 748.

cashing out the card, defendants were merely guaranteeing there would be no separate transaction charges. And since, as discussed above, there is no way to know how an "excellent" rate would be measured, there is similarly no basis to conclude that the retail rate charged by the defendants constituted, or included, any undisclosed "fee" other than a standard retail markup.

Pennington's proposed definition of "fees" and "commissions" to include the retailer's profit margin depends heavily, but erroneously, on *Covarrubias v. Bancomer, S.A.*, 351 Ill. App. 3d 737, 740 N.E.2d 947 (Ill. App. Ct. 2004). *Covarrubias* held that a complaint sufficiently stated a consumer fraud claim because the defendant, a monetary exchange, charged what was labeled a "net fee" in addition to an exchange rate that they did not disclose had been marked up; the defendant, the court found, had made an affirmative representation that its net profit on the transaction was less than it actually was. The case was, then, a case of mislabeling and the court expressly distinguished *In re Mexico Money Transfer Litigation* on that basis. There is no similar misstatement here about the defendants' "net" take from the Cash Passport transactions and *Covarrubias* therefore has no relevance.[9]

Nor does Pennington allege that she was promised a particular numerical exchange rate and then charged another. The complaint does not allege that there were markups above the rates disclosed to Pennington (either in person or online); rather, it alleges only that there were markups above the interbank rate. In her response brief, Pennington tries to remedy this flaw, saying that whether there was a markup over the posted online rates is "the crux" of the complaint and asserting that it is a matter for discovery to discern whether the defendants marked up the posted rates. *See* Pl.'s Resp., Dkt. 47, at 11 & n.6. But this argument fails on several grounds. First, the complaint itself never once alleges that the defendants charged rates that were marked up in comparison to the published online rates. Second, even if it were to claim that the defendants marked up the posted online rates, Pennington would still have to state a plausible claim before being entitled to discovery. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). This complaint provides no fact allegations that plausibly suggest that the defendants marked up the posted online rates. Finally, even if Pennington were to amend her complaint again to allege that she was promised the online rate but received another rate, by attaching those archived website exhibits to the complaint she would likely also plead herself out of court by introducing the disclaimers that the online rates differ from the in-store rates, and that the rates online and in stores differ further from the interbank rate.[10]

---

[9] The *Covarrubias* ruling also has been called into question for relying heavily on reasoning not present in the retail currency exchange context. *See Sanchez*, 372 Ill.App.3d at 458, 865 N.E.2d at 418 (distinguishing the affirmative mislabeling of profits from simply failing to reveal the source of profits in a transaction).

[10] By applying the same process that Pennington argues one can see the Travelex website as it existed in July 2011, *see* Am. Compl., Dkt. 35, at 6 n.2, when Pennington purchased the Cash Passport, one can also see that the website disclaims that the "online rates are exclusive to our website and are not available in-store," and further explains why the interbank exchange rate is not available to ordinary consumers who only buy "relatively small amounts of foreign currency in comparison" to large financial institutions. *See Exchange Rates Explained*, Travelex, https://web.archive.org/web/20110614163343/http://www.us.travelex.com/US/For-

Because Pennington has not sufficiently alleged that she was actually charged fees or commissions for loading or cashing out her card, her contract and fraud claims fail to the extent that they are predicated on alleged promises that there would be no fees for loading or unloading the card. *See Reger Development, LLC, v. Nat'l City Bank*, 592 F.3d 759, 766 (7th Cir. 2010) (a decision to exercise legitimate contractual powers "cannot give rise to any suit for breach"). And because the representations of no fees or commissions did not turn out to be false, these statements cannot support a common law fraud claim, which requires actually false statements. *See Jane Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 2012 IL 112479, ¶ 28, 973 N.E.2d 880, 889 (Ill. 2012) (requiring that statements supporting a fraudulent misrepresentation claim be false). And even though the IFCA liability can arise from literally true disclosures when stated in a misleading manner, *see Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 52, 643 N.E.2d 734, 743 (Ill. 1994) (holding that a commodities broker violated the ICFA by labeling a personal commission as a "foreign service fee"), Pennington has not alleged that the defendants made any misleading statements (or any statements at all) about the profit being made in the transactions. *See Sanchez v. Am. Express Travel Related Servs. Co.*, 372 Ill. App. 3d 449, 459, 865 N.E.2d 410, 418-19 (Ill. App. Ct. 2007) ("Thus, unlike [*Covarrubias*], the record shows that defendant at bar did not represent the transaction fee as a 'net sale fee' nor did it imply that the interbank exchange rate was zero."). Therefore, Pennington's contract claim and her fraud claims must be dismissed.

### III. Unjust Enrichment

Pennington has also pleaded an unjust enrichment claim in the alternative to her breach of contract claim. Specifically, the unjust enrichment claim is an alternative theory in the event that the Court determines that that any of the defendants profited from improper conduct, even in the absence of a contractual relationship.

Regardless of whether unjust enrichment claims can stand untethered from an underlying fraud or breach of contract claim, Pennington's unjust enrichment claim must fall with her other claims. It is unclear whether unjust enrichment is an independent cause of action in Illinois. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (collecting mixed case law on the issue). One thing is clear, however—unjust enrichment claims, whether independent or tethered to other claims, require an allegation that the defendant or defendants engaged in some form of improper conduct. *Id.* at 517; *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("We rejected [the plaintiff's] ICFA claim. And absent that the defendants engaged in an unfair practice, [the plaintiff's] unjust enrichment claim is not viable."). As discussed above, Pennington has not sufficiently alleged facts that would suggest any unlawful conduct prohibited by contract, common law fraud, or the ICFA. Because Pennington fails to allege improper conduct by the defendants, the Court must also dismiss the unjust enrichment claim.

* * * * *

Accordingly, the Court grants the defendants' motions to dismiss the amended complaint. Although it seems unlikely that the plaintiff can cure the deficiencies identified in this complaint,

---

Individuals/Rates/Online-Rates/Exchange-Rates-Explained/ (archived version captured June 14, 2011).

and she has already amended the complaint once in response to the defendants' arguments, the Seventh Circuit has instructed that plaintiffs generally should be given at least one opportunity to cure deficiencies in a complaint that have been identified by the court. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.,* 786 F.3d 510, 519-20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). Accordingly, the dismissal is without prejudice. Plaintiff should be prepared to advise the court at the status hearing set for August 29, 2015, whether she wishes to file a second amended complaint.

Dated: July 17, 2015

John J. Tharp, Jr.
United States District Judge